417 So.2d 1028 (1982)
Robert Warren CHAPMAN, Appellant,
v.
The STATE of Florida, Appellee.
No. 81-1351.
District Court of Appeal of Florida, Third District.
July 13, 1982.
Rehearing Denied August 25, 1982.
*1029 Bennett H. Brummer, Public Defender and Elliot H. Scherker, Asst. Public Defender, for appellant.
Jim Smith, Atty. Gen., and Theda R. James, Asst. Atty. Gen., for appellee.
Before SCHWARTZ and DANIEL S. PEARSON and FERGUSON, JJ.
FERGUSON, Judge.
Defendant appeals from a jury conviction for robbery and escape. He contends the trial court erred in denying his motion for mistrial based upon (1) repeated references by the prosecutor and state witnesses to offenses not charged in the information, (2) testimony elicited from a defense witness regarding the prior criminal record of the defendant, which improperly and prejudicially tended to show that defendant had bad character. We agree and reverse.
Miss Jaime Joyce, age 16, the alleged victim of a robbery, testified as follows: On the morning of July 11, 1980 Jaime received a telephone call from an individual identified as Dennis who said he was on his way to her home. She had met Dennis at the beach one week earlier. Dennis arrived about 11:15 a.m. on a motorcycle accompanied by the defendant Chapman. Initially, Jaime stayed in her bedroom because a neighbor had told her that Dennis was "bad news" but she subsequently allowed Dennis and Chapman to enter the house. The defendant offered her quaaludes and cocaine which she refused. However, later she joined them in a "couple of puffs of marijuana". The three of them, defendant, Dennis and Jaime, talked for approximately thirty minutes. Defendant then produced a gun and told her to "get on the floor, this is a robbery". Dennis was also instructed to lie on the floor. After complying, Jaime, covered with pillows and sheets, was unable to observe subsequent events. She heard the defendant make a telephone call and later heard other persons inside the house and "drawers being pulled out and things being thrown around". When she sensed that everyone had left, she went to the window and observed the defendant, wearing a denim jacket and blue jeans, riding away on the motorcycle. Jaime telephoned her mother who contacted the police. Jaime was present when the defendant was arrested later that day but she did not identify him to police officers because she was frightened.
The first of the errors complained of is based on references to a sexual battery of the victim which the state had decided not to prosecute for reasons not appearing in the record. It was conceded that if a sexual battery had occurred, the defendant was not the perpetrator. At the trial, all witnesses had been cautioned before taking the witness stand to avoid mentioning the alleged rape.
The uncharged offense was first referred to on cross-examination of Jaime about out-of-court statements she had given to a policeman which were inconsistent with her in-court testimony:
Q. And do you remember when he was discussing with you the man who left on the motorcycle?
A. Yes.
Q. And in response to the question you have the answer, this answer, [sic] "Was this the same description, the same clothes that you just described...?" And, your answer, "Oh, I didn't see the guy's clothes when he left on the motorcycle. I didn't pay attention really to that I don't know if it was the same guy that left that I told you about earlier... ."
After the victim admitted that the statement had been given by her to investigating officers the attempt to impeach continued:
Q. My question to you is this: Your answer is different today then it was then. Yes?
A. Uh-huh.

*1030 Q. It is not?
A. Well, I said something, but you said, you said, you told me I couldn't say it.

At a side-bar conference, defense counsel requested the court to direct the witness to respond to the question with a yes or no answer. Defense counsel was cautioned to "be very careful" because the witness was allowed to explain inconsistent statements and in this case the rape would be a logical explanation. The proceedings continued in the presence of the jury:
THE COURT: Miss Joyce ... it is very important that you listen a lot more carefully to the questions than I think you have been...
Just listen to the question and answer as simply as possible, and if at all possible, and by a simple yes or no answer.
Now you are not restricted to that. It is not like you have to say something and then at that point you are stuck because it sounds terrible. If you want to explain your answer, just as soon as you answer, you can say, "I would like to explain that," and then give the explanation that you care to, within the parameters that you have been talking about.[1]
The next witness called by the state was Mrs. Glynda Joyce, mother of the victim. On direct examination she testified:
Q. MR. NORRIS [Prosecutor] Did you talk to Jaime, Ma'am?
A. On the telephone.
Q. What did she say?
MR. GAER: Judge, I must object to that.
THE COURT: Overruled.
Q. [By Prosecutor] What did she say, Ma'am?
A. She said, "We were robbed, somebody get me to a doctor and don't call the police."
The state's next witness was Detective Slovonic. The following exchange took place on direct examination:
Q. [By Prosecutor] What information did you receive from the victim, Jaime Joyce?
A. When I interviewed Jaime Joyce, she told me that earlier in that day, approximately an hour and a half prior to my arrival on the scene, that two white males had forced their way into the house at gunpoint. After getting into the house they found her, covered her head with a sheet, laid her on the living room floor. Then as she was laying there, two or three other white males were let into the house.
Q. Excuse me, only refer to the robbery in this case when you are testifying.

A. Correct.
Q. Go ahead.
MR. GAER: Judge, I must object and I must approach the bench again.[2]
A fourth error allegedly occurred during cross-examination of Sandra Bobik, an employer and friend of the defendant who was called as a defense witness. Mrs. Bobik had testified that she first met the defendant in 1971 or 1972 and then met him again in 1980 while visiting relatives in Fort Myers, Florida. The cross-examination continued as to his whereabouts prior to 1980:
Q. [By Prosecutor] you know he had been out in Reno, [sic] Oklahoma, and Ashley, Oklahoma, did you know about his 
MR. GAER: I am going to object.
THE COURT: Overruled.

*1031 Q. Do you know where he has been in the past, ma'am?
A. Roughly.
Q. Roughly?
A. Uh-huh.
Q. Do you know where he had come from just before Ft. Myers?
MR. GAER: I am going to object. I don't see the relevance of this.
THE COURT: Overruled.
Q. [By Prosecutor] Where, ma'am?
A. Where had he come from?
Q. Where, Ma'am?
A. He had just been released out of jail.

Q. That wasn't what I asked. Was it Kentucky or 
MR. GAER: I must object. I must approach the bench for another motion.
THE COURT: Motion is denied.
Regarding the allusions to a rape, the state contends that evidence of another crime was properly admitted, citing Williams v. State, 110 So.2d 654 (Fla. 1959), cert. denied, 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 86 (1959) and Smith v. State, 365 So.2d 704 (Fla. 1978), cert. denied, 444 U.S. 885, 100 S.Ct. 177, 62 L.Ed.2d 115 (1979). Alternatively it is contended that any reference to the collateral crime took place outside the jury's presence. We reject both arguments.
The holding of Williams is now codified in the Florida Evidence Code as Section 90.404(2), Florida Statutes (1979), and provides in subsection (a):
Similar fact evidence of other crimes, wrongs or acts is admissible when relevant to prove a material fact in issue, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity.[3]
In order to introduce evidence of another crime not only must the requirements of Section 90.404(2)(a) be satisfied, but the state must also prove by clear and convincing evidence the collateral crime and a connection between the defendant and that crime. State v. Norris, 168 So.2d 541 (Fla. 1964). Citing to State v. Norris, the court in Dibble v. State, 347 So.2d 1096 (Fla. 2d DCA 1977) reversed a conviction where there was no proof that the similar crime was committed by the person on trial. Accord Franklin v. State, 229 So.2d 892 (Fla. 3d DCA 1970); Parnell v. State, 218 So.2d 535 (Fla. 3d DCA 1969). The record in this case is devoid of evidence pointing to appellant as the perpetrator of another crime.
The authorities relied upon by the state for the proposition that evidence of other crimes is relevant if it establishes the entire context out of which the criminal action arose can be distinguished. In Smith v. State, supra, and Nickels v. State, 90 Fla. 659, 106 So. 479 (1925) there was no question but that a second crime had been committed and that the defendant was a perpetrator. In Jacobson v. State, 375 So.2d 1133 (Fla. 3d DCA 1979), cert. denied, 385 So.2d 758 (1980) this court held that reference to the collateral crimes was not reversible error because the defendant's lifestyle in organized crime was pervasive and integral to the commission of the crime charged. In Horner v. State, 149 So.2d 863 (Fla. 3d DCA 1963), the defendant was charged with extortion by threatening injury to the reputation *1032 of the victim if the victim testified against him in a pending criminal action. The court allowed the reference to the other pending criminal action under another recognized exception to the general rule prohibiting evidence of other crimes, holding it was impossible to give a complete or intelligent account of the crime charged without referring to the other pending criminal action.
Although a collateral crime was not specifically identified in the jury's presence, the occurrence of an uncharged act of violence to the person of the victim was conveyed with certainty. It was reasonable for the jury to infer that the other horrible act was committed by the accused since no one else was on trial.
There is no showing in the trial record nor here on appeal that fact evidence of another crime was relevant to prove any material fact in issue. References to another crime along with the testimony that defendant had just been released from jail were relevant solely to prove bad character or propensity.
The victim's vague reference to a collateral occurrence, in the awkward circumstance of attempting to explain her prior inconsistent statement, might not alone have been grounds for reversing the conviction.[4] But the mother's testimony suggesting that her daughter had been injured, the instruction to the police officer in the presence of the jury to limit his testimony to the robbery, and questioning of the defense witness as to the defendant's whereabouts prior to meeting the defendant (which brought out the "expected" reply that he had been in prison)[5] were deliberate efforts to bring before the jury irrelevant evidence, the cumulative effect of which was to cause prejudice.
The prosecutor's questioning of both Mrs. Joyce and Mrs. Bobick, which led to two of the complained of errors, was preceded by defense counsel's vehement objections. Defense counsel knew, and the prosecutor should have known as well, that the line of questioning would evoke a prejudicial response. On both occasions the line of questioning ceased when the improper evidence was brought forth; there was not the slightest suggestion that the inquiry had any other relevancy.
We reverse and remand for a new trial.
NOTES
[1] Outside the presence of the jury the court candidly gave its justification for denying a motion for mistrial:

MR. GAER: ... if ever I was entitled to a mistrial, I am entitled to one now.
THE COURT: You might as well go all the way on it. If you want to bring, if this girl wants to explain her answer and say that she'd been raped, go right ahead and let her say it. I see nothing wrong with it, and I see nothing wrong with seven hundred other crimes if that is an explanation of why she lied, and you are asking her why she told two different 
[2] Outside the presence of the jury defense counsel made a motion for mistrial:

* * * * * *
THE COURT: I am going to deny the motion for mistrial, but I think there may very well be grounds on appeal, I don't know...
[3] The concern of the legislature for overzealous misuse of similar crime evidence is manifested in Sections 90.404(2)(b) 1 and 2, Florida Statutes (1979), which require:

1. When the state in a criminal action intends to offer evidence of other criminal offenses under paragraph (a), no fewer than 10 days before trial, the state shall furnish to the accused a written statement of the acts or offenses it intends to offer, describing them with the particularity required of an indictment or information...
2... . after the close of the evidence, the jury shall be instructed on the limited purpose for which the evidence was received...
We note in passing, though the point was not preserved below and consequently is not an issue here, that there was no compliance with Section 90.404(2)(b). The statute contemplates a pre-trial determination as to the admissibility of similar crime evidence.
[4] The witness would be limited to a more direct response in explaining her inconsistent statements, i.e., fear of violent reprisal, since reference to the collateral crime would not be admissible under Section 90.404(2), Florida Statutes (1979) and the probative value of mentioning the rape would be outweighed by the danger of unfair prejudice. See § 90.403, Fla. Stat. (1979).
[5] We think it no coincidence that El Reno, Oklahoma is the location of a federal penitentiary and defendant has served time for a federal conviction.